**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 25-378** |
| **PRICE FELKER** | **:** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Price Felker stands before this Court for sentencing for his distribution of images and video of child sexual abuse material to other child sex offenders over the internet. At the time he committed these crimes he had been well immersed in the underworld of child sexual abuse and exploitation for years, visiting live-streaming sites where he exposed himself to minors and corresponding with other child sex offenders to arrange his participation in the hands-on sexual abuse of their children.

His crimes are so serious that he faces a sentencing Guidelines range of 78 to 97 months' incarceration – 60 months of which are mandatory – despite having no prior criminal record. For these reasons, as well as for the reasons provided below, the government recommends a sentence of incarceration at the top of the advisory Guideline range, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C.

§ 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1] In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. *United States v. Langford*, 516 F.3d 205, 214-18 (3d Cir. 2008).]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory Guideline range and of the Section 3553(a) factors.

I.      **BACKGROUND[2]**

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

2 The factual background recited herein is taken from the Government's Change of Plea Memorandum, to which the

*continued* . . .

On August 26, 2025, the Government filed a one-count Information charging defendant Price Felker with distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2). The defendant entered a plea of guilty to the Information on September 11, 2025, before this Court.

The charge arose as a result of an FBI investigation that began in November 2024, when a Tinder user (later confirmed to be defendant Price Felker) sent two messages to an FBI Task Force Officer who was acting in an undercover capacity ("UC") as part of the FBI's Child Exploitation and Human Trafficking Task Force. On November 23, 2024, the messages from Felker began with, "Hey man. Love pervy dads. Would love to hear about your fam." On December 5, 2024, the UC responded asking if Felker would want to chat using a different messaging platform. Felker agreed to chat on a different platform and responded, "I'm on Tele @JawnBoy13" (referring to the platform Telegram).

The communications on Telegram began on December 9, 2024, and lasted just two days, through December 10, 2024.  The UC messaged Felker at @JawnBoy13 and portrayed that he had a 9-year-old son whom he was sexually abusing. The following is a portion of the messages between Felker (as JawnBoy) and the UC :

December 9, 2024:

JawnBoy: "So you're a pervy dad? Big perv myself"

UC: "Nice! Love meeting other pervs. Yep. Son is 9!"

JawnBoy: "Younger the better, but I like anything pre puberty. What do you get up to with him?
JawnBoy: Sent an image of a male's erect penis, followed by, "Wish he was sucking it."

UC: "Nice cock. Where are you from?"

---

defendant stipulated before the entry of his guilty plea. These same facts are contained in the Presentence Report, to which the defendant has not filed any objection.

JawnBoy: "Thanks. Think he would like it? I'm in Philly. You?"

UC: "Nice, close. I'm in DC.

JawnBoy: "Awesome. I come down to DC sometimes for work."
Jawnboy: Sent an image depicting a prepubescent boy laying naked in a bathtub with his buttocks exposed
JawnBoy: "I get off to this pic sometimes."

UC: "Fuck yah. How many times have you stroked it to that one."

JawnBoy: "Probably dozens of cums for him. Just want to bury my face in that little ass."

JawnBoy: "My experience is limited to fooling around with boys online or through Snapchat. Plus whatever porn I can find."
JawnBoy: I have a 19 year old fuck buddy which is hot, but I obviously want to get my hands on someone much younger.
JawnBoy: "So tight! I haven't gotten my dick in there yet. He wants to fuck me. I'm 32."
****
JawnBoy: "Bazoocam. There's sometimes people streaming porn on there. And there's sometimes kids to flash.

JawnBoy: "I've seen some hot sadistic vids too, babies, kids tied up and hanging upside down getting pissed on. Saw a vid of a guy taking a shit on this toddler while he was tied up."
JawnBoy: "I would be gentle with a kid I think but it's hot to watch."

December 10, 2024:

JawnBoy: "Want to see a couple PG pics of my nephews?"

UC: "I would love that."

JawnBoy: Sent two images of clothed boys - one was of a prepubescent boy approximately 5 years old standing on the beach. The other was of a boy approximately 13 years of age who was standing in a red and blue sleeveless shirt with a race-bib attached to it. NOTE – law enforcement confirmed that the boys depicted in the images were FELKER's actual nephews.
JawnBoy: "They're pretty cute."

UC: "Hell yah they are. Skinny, love that."

JawnBoy: "Mmmmhm."

UC: "The one on the left is ideal."

JawnBoy: "Yeah I figured you' like him."

UC: "How old are they? He's gotta be like 7."

JawnBoy: "Pretty sure he's just 5. Older is 13 now."

UC: "ooooooo. How often do you get to see them….. I would not behave myself if I were you."

JawnBoy: "Haha I don't get to see them often unfortunately, my family lives down south."

UC: "Ah gotcha."
UC: "Maybe I'm the halfway point if you need a break on the way to see them."

JawnBoy: "Hell yeah. Will need some relief for that long drive. Maybe you and boy could help with that."

UC: "100. It's a dream of mine to share in real life and not just online."

JawnBoy: "Yeah man, happy to help with that dream."

UC: "I'm sure you are. Gotta know you're legit first, but you're def making me feel like you are."
UC: "I'll have him this weekend."

JawnBoy: "Bona fide perv here man."

UC: "Excellent."

JawnBoy: "Have you shared him online before?"

UC: "Yah I've shared him with other dads….. done live vids for them and them for me."

JawnBoy: "Nice, that sounds hot."

UC: "It's amazing. I still have some of the vids on my offline stash."
UC: "Along with my own stuff."

JawnBoy: "Would love to have a viewing. Get some pop corn and get our dicks out."
JawnBoy: "Have I earned enough trust for a PG pic of boy yet?

UC: "Perhaps. Let me see what I have. FYI I never send face."
UC: Sent two images: one depicting a child laying down wearing underwear and a shirt with the shirt pulled up exposing his lower back and a second image depicting an erect penis over children's underwear. UC then wrote, "Had some fun with those undies. More like pg-13 lol."

JawnBoy: "Mmm hell yeah man."
JawnBoy: "I don't mind PG 13 or R. He looks skinny."
JawnBoy: "Want to pull those undies off him so bad."

UC: "I love to."

JawnBoy: "Gonna cum to that man."

UC: "Hell yah."

JawnBoy: "You like me jerking to your boy?"

UC: "Love the idea of someone stroking to his little ass."

**JawnBoy: Sent an image depicting a nude adult male laying down holding his erect penis with ejaculate, followed by "You show him this nice cumshot he just have me. *gave."**

UC: "Fuck yah I will. I'll save that for Saturday morning."
JawnBoy: "Can't wait to hear his reaction."
JawnBoy: "Give him a big thank you from me, and tell him that he looks hot in his undies."
JawnBoy: "Let me know anything else I should send to share with your boy. Def all the cum shots he gives me."

UC: "I'll take anything. I've shared vids with him before too.

JawBoy: "Oh yeah? Like fucking vids? I could take a vid of me jerking to his pic and talking to him."
JawnBoy: "I'll see what I can do."
**JawnBoy: "Okay I recorded a little thank you video with my dick out that he might like."**
**JawnBoy at 4:34 p.m. – Sent a 25-second video depicting FELKER nude, with the lower half of his face visible, sitting on a chair rubbing his erect penis while saying, "Hey boy, just sending a little video to say that I think you're really hot. Your dad sent me a photo of you in your undies. You look so sexy. I came to that picture, and I think you saw that because I sent a picture of my cum shot to your dad. So, I just wanted to say thank you. I think you are such a little hottie. I hope I get to see more of you. Later boy."**

JawnBoy: "Hell yeah. Would love to see him stroke you and get fingered."
JawnBoy: "He must have such a nice hard little dick to suck."

UC: "He'll do what his dad tells him to do, especially if he's getting something out of it."

JawnBoy: "Damn right."
JawnBoy: "My pedo cock is all hard again man."

UC: "Could have a lot of fun if you ever took a trip down here."

JawnBoy: "Hell yeah we could. Porn, spit-roast, strip show… so many possibilities."

UC: "I'd love to have you. Love to meet another pedo and also check a box on my end. See if I trained my boy well enough to please someone else."

JawnBoy: "It'll be like a little oral exam for him."
JawnBoy: "Honestly it's a good life skill, he can get whatever he wants in life if he sucks cock good."

UC: "You'll have to be his first judge."
UC: "Because I am not impartial lol."
JawnBoy: "I'll do my best not to cum as soon as he touches my dick and give an honest assessment."

## Identification of PRICE FELKER

- **Telegram**: On January 8, 2025, subscriber information was received from Telegram, pursuant to an administrative subpoena, in relation to the account @JawnBoy13. The last login for the account was December 11, 2024, using IP address 108.52.166.241 at 7:11 p.m. and the phone number associated with the account was 704-941-0002.

- **Verizon Fios**: On January 27, 2025, subscriber information was received from Verizon Fios, the Internet Service Provider ("ISP") for the IP address 108.52.166.241 at 7:11 p.m on December 11, 2024, the time of last login for the Telegram account. The subscriber of the internet service was Price Felker. The service address was Felker's residence at 614 S. 6th Street, Apartment 1, Philadelphia, Pennsylvania 19128. The phone number associated with the account

was 704-941-0002.

- **Verizon Wireless**: On January 14, 2025, Verizon Wireless provided subscriber information pursuant to an administrative subpoena for phone number 704-941-0002 showing that it was registered as part of a phone plan subscribed to by C.D.[3] The phone plan had been active and unchanged since January 1, 2021. C.D. was confirmed to have resided in Philadelphia until 2022, and then moved to San Francisco, California. Agents confirmed that C.D. is a former roommate of Price Felker.

- **Google LLC**: On March 10, 2025, Google LLC. provided subscriber information pursuant to an administrative subpoena in relation to the PRICE.FELKER@GMAIL.COM account. The account was created on March 4, 2014, with the user identifying himself on the account as Price Felker. The account recovery phone number was 704-941-0002 (same phone number associated with the suspect Telegram account and all the other providers above). The recovery email was in a version of the name of C.D., Felker's former roommate. Google identified that the PRICE.FELKER@GMAIL.COM account was paid for through Google Pay. On August 13, 2024, a postal address was created for the Google Pay account in Price Felker's true name, at his true residence of 614 S. 6th Street, Apartment 1, Philadelphia, Pennsylvania (PA) 19128. On October 11, 2024, the subscriber again created a postal address for his Google Pay account using the same information – Price Felker, at his true address – and added the phone number 704-941-0002 (same phone number associated with suspect Telegram account). On February 5, 2025, the subscriber once again created a postal address for the Google Pay account using Price Felker's true address.

**Snapchat Distribution of Child Pornography**

---

3 True full name known to law enforcement but omitted from this public filing to protect the identity, as C.D. was not identified as being involved in this criminal activity.

After the FBI identified JawnBoy as Price Felker, agents also discovered that Felker had previously distributed child pornography through his Snapchat account two years earlier. On April 3, 2022, Snapchat submitted CyberTipline Report 121466824 to NCMEC to advise they had identified the Snapchat user with username PJPRICEBUSTER, email address PRICE.FELKER@GMAIL.COM and phone number 704-941-0002, had saved, shared or uploaded a file of suspected child pornography using his Snapchat account. **(Count One – distribution of child pornography, hereinafter child sexual abuse material "CSAM").**

Snapchat included the video with the CyberTip, which FBI agents reviewed and confirmed that it qualified as child pornography:

> File name: pjpricebuster-None-8bf64c5f-c5fc-58c5-84e8-45a5a2b1be25~15-270482e724.mp4. File contains a 12-second video depicting a nude, prepubescent minor girl laying naked on a bed on her stomach, while an adult male touches her vagina and anus from behind with a phallic shaped item.

As is their standard practice, once Snapchat filed the CyberTip, they shut down the suspect account and notified Price Felker by email (to the PRICE.FELKER@GMAIL.COM account he registered when he created the Snapchat account).

### Search Warrants

- **Google Account**: On July 2, 2025, EDPA search warrant 25-1382-M was issued to Google for the account PRICE.FELKER@GMAIL.COM. As noted above, this account was created in 2014 by Price Felker with the same registered phone number 704-941-0002 that is tied to the suspect Telegram account. The account review uncovered:

  - A video of Felker speaking to the camera, which matches the face and voice of the naked video Felker distributed of himself masturbating and talking to the "9-year-old boy."

- An email from Snapchat to Price Felker on April 3, 2022, notifying him of the closure of his Snapchat account for a violation of their terms of service.

- A string of emails following the initial Snapchat notification, where Felker inquires numerous times as to what the specific violation was that caused the shut down of his account. Each time, Snapchat referred him to a link containing their online Terms of Service.

- **Residence**: On May 13, 2025, EDPA search warrant 25-966-M for Felker's residence at 614 S. 6th Street, Apartment 1, Philadelphia, Pennsylvania (PA) 19128 was executed. The defendant was home at the time of the execution of the search warrant and remained while agents searched his home. Initially he cooperated with agents and identified his phone number (704-941-0002) and advised that his phone had a passcode which he had not shared with anyone else. He then asked for an attorney and the interview was concluded.

The following evidence was located:

- MacBook Air laptop computer with power cord, bearing serial number FVFHHASFQ6. The computer was accessed using Felker's fingerprint, as authorized by the search warrant. A limited preview forensic examination was conducted on scene, with the following results:

  o One image was found in the Recent Images folder that was dated December 10, 2024, which depicted an adult's erect penis with ejaculate. This image is the same as that sent by Felker (using the JawnBoy username) over Telegram to the FBI UC which the defendant requested be shown to the 9 year old "boy."

  o User attribution linking the device to Felker, including selfie photographs, videos, photographs with Felker and C.D., and email chains with Felker and various family members.

- iPhone bearing IMEI: 351461187621866
  o Apple ID: price.Felker@gmail.com, and associated phone number is 704-941-0002.

  o Emails using Felker's associated Gmail account to Snap to discuss the shut down of his account.

  o Texts between Felker and others (including C.D.), where Felker discussed his Snapchat account being shut down for distributing "porn" shortly after

the closing of the account, long chats where he talks about his long-standing problem with porn, his worries about what would now happen that he was caught, and his involvement with beastiality porn.

- o Attribution evidence:
  - A photograph of Felker's passport
  - Selfie style photograph of Felker where he is naked (photo taken in mirror from his nose down to top of hip area). He is holding the iPhone to take the photograph.
  - Photo of one of his nephews wearing a race number and competing in a run (same child whose photo Felker distributed to the UC)
  - Photograph of Felker's Social Security card

- Journals and handwritten notes:
  Numerous handwritten pages were found in Felker's home. He appeared to journal about issues that were troubling him, and made numerous admissions about his sexual abuse and exploitation of children, including:

  - o 1B7_Scan1: "Some of the guys who saw my dick looked like they were high-school age." and "I feel like a pervert for showing my dick to teenagers."

  - o 1B7_Scan2: "What I said to the young people to win their trust and how I then betrayed that trust. How I took advantage of them. How I showed them my penis. How I preyed on them . How I asked, "want to see something cool" and got them to say yes before showing them my penis. How I have felt sexually attracted to young people."

  - o 1B7_Scan3: "I asked them, "want to see something cool?" and then I showed them my penis," "I have felt sexually attracted to young people," "Toddler , baby pictures. Raped baby," "Yes, I sought out child pornography, but I never found any. The closest I came was pictures of naked toddlers and babies, none of witch qualify as child pornography. Not to mention the fact that I never hurt anybody. I was just seeking a way to hurt myself, to make myself feel guilty and make myself feel bad." "I am seeing Dr. Harris on Wednesday. She has a doctorate. She will be able to help me. I have completely stopped all sexually compulsive behavior. I now recognize the severity and depth of my problems, as well as how desperately I require help." The words, "Pedophile", "Incest", "Beastiality" are underlined and dispersed across the top of the page, "confusing the urge to find the most perverse porn/scenarios on Chatroulette with actual interest in those subjects, kids," "I think I'm a pervert."

  - o 1B7_Scan4: Listed under "Fantasies" was "Pedophilic erotica" and "Thoughts about exposing myself to kids in bathroom," "Pedophile news

stories/tv specials," "Beastiality, horse &Dog," "The things I am focusing on never hurt anyone else. Reading erotica harms no one. Showing my dick (if I even got that far) to a girl who appeared underage but was definitely in control and knew what she was doing is not a bad thing. Showing my dick to kids who had certainly seen others on Chatroulette before and since did them no harm. Watching porn videos harms no one. I have not hurt anybody."

## II.     SENTENCING CALCULATION

### A.      Statutory Maximum Sentence.

The maximum sentence that may be imposed on the defendant for his distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2) is a term of imprisonment of 20 years' incarceration, a 5 year mandatory minimum term of incarceration, a minimum 5 year term up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution of at least $3,000 per victim pursuant to 18 U.S.C. § 2259(b)(2)(B), and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, as well as an additional special assessment of up to $35,000 pursuant to 18 U.S.C. § 2559A(a)(2).

### B.      Sentencing Guidelines Calculation.

The Probation Office correctly calculated the defendant's advisory guideline range as follows: the base offense level is established at level 22, pursuant to USSG § 2G2.2. PSR ¶ 30. An additional two points are added because the child sexual abuse material depicted a prepubescent child under the age of 12 years, pursuant to USSG § 2G2.2(b)(2). PSR ¶ 31. Another two levels are added because the offense involved distribution, pursuant to USSG § 2G2.2(b)(3)(F). PSR ¶ 32. Another two levels are added because the offense involved the use of a computer, pursuant to USSG § 2G2.2(b)(6). PSR ¶ 33. Finally, another three levels are added because the defendant's crime involved at least 150 but less than 300 CSAM images. PSR

¶ 34. The defendant receives a total decrease of three levels for his timely acceptance of responsibility pursuant to USSG § 3E1.1(a) and (b). PSR ¶ 40-41. His adjusted offense level is calculated at level 28. PSR ¶ 42. As the defendant has no prior criminal history he is established in a Criminal History Category I, PSR ¶ 43-45, resulting in a final sentencing Guideline range of 78 to 97 months' incarceration, 60 months of which is mandatory. PSR ¶ 95. Both parties agree with this calculation.

## III.   <u>ANALYSIS</u>

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

A.    **Consideration of the 3553(a) Factors Regarding Imprisonment.**

1.    **Nature and Circumstances of the Offense**

The defendant's crimes are heinous. He accessed, viewed, and distributed out over the internet images involving the horrific sexual abuse of a prepubescent young girl by an adult sex offender. By contributing to and sharing in the world of CSAM distribution, the defendant and others like him perpetuate the harm to the child victims depicted in these images by creating demand and fueling this market. His crimes lead to additional sexual abuse of children and the further production of CSAM images and videos. Given the scope of the internet, the exploitation of these young children is ongoing and relentless. As the Supreme Court has explained, "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Government have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008).

Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Sentencing Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003).* Indeed, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep. No. 108-66; S. Rep. No. 104-358*, especially in light of the continuing harm caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles,

and child pornographers," which results in a robust and growing market for child pornography and increased abuse of innocent children. *See Child Pornography Prevention Act of 1996,* Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified at 18 U.S.C. § 2251 note; *United States v. MacEwan*, 445 F.3d 249, 250 (3d Cir. 2006); *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). ("[T]he victimization of the children involved does not end when the pornographer's camera is put away.").

Each view, download and distribution of child pornography re-victimizes the children who were abused to create that particular piece of child pornography. In *MacEwan*, 445 F.3d at 249-50, the Third Circuit upheld the defendant's admittedly "harsh" sentence for distributing and possessing child pornography based, in large part, on the extreme harm to the children who are victims of sexual abuse because

> "[W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years. Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere 'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.' … Furthermore, 'it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.'" (Internal citations omitted.)

There can be no doubt that the defendant's crimes are serious and warrant significant punishment. In this case, however, the circumstances of the defendant's crimes provide this Court with additional evidence of the extent to which he had immersed himself in the underworld of child sexual abuse. The defendant involved himself in these crimes for years. His journal entries detailed his sexual attraction to toddlers and babies, as well as his sexual interest in beastiality and incest. PSR ¶ 23. In his own words, he admitted he was attracted to sadistic and

- 15 -

violent images that depicted the rape of babies, PSR ¶ 23, and "babies, kids tied up and hanging upside down getting pissed on," and toddlers who were tied up and defecated upon by adult men. PSR ¶ 14.

When the online images and videos no longer satisfied him, he ventured out to connect directly with children - by his own admission he visited live-streaming sites to find children and minor teenagers and exposed his penis to them. PSR ¶ 23. In his own words he described himself as a "predator," in that he would gain the trust of these kids and then used it to satisfy his own deviant desires. *Id.* He somehow rationalized in his mind that he was not "hurting" anyone by "simply" watching CSAM videos, or by showing his "dick" to kids who had "certainly seen others before and since." *Id.*

For years he engaged in these crimes, culminating in his efforts to meet up with a 9-year-old boy for sex. Beginning in November of 2024, *more than two years after he involved himself in distributing the CSAM that led to these charges*, the defendant engaged in depraved communications with an undercover agent whom the defendant believed was the father of a 9-year-old boy. PSR ¶ 13. From the beginning he described himself to the UC as a "perv" and told him that he was sexually interested in very young children ("Younger the better, but I like anything pre puberty."). PSR ¶ 14. Over the course of two days, the defendant repeatedly planned with the UC to meet up with him and his 9-year-old son, describing in graphic detail the sexual acts he wanted to do to the child and advising the UC, "I'll do my best not to cum as soon as he touches my dick." PSR ¶ 14. As part of his communications, the defendant made a home-made video of himself masturbating while he talked to the 9-year-old boy, and then sent the video to his "father" (the UC), requesting that he show the child his pornographic recording. *Id.*

Equally disturbing, while talking with the UC – and believing him to be a child sex

offender – the defendant sent him two images that depicted his own young family members. PSR ¶ 14. These images were not pornographic, but they depicted the children's faces, so that they could be clearly identified. *Id.* He told the UC where they lived, and their ages. *Id.* One image depicted his young family member wearing a race bib – so that if the UC had been an actual child predator, he could have easily found this child on his own. *Id.* The chats clearly show that the defendant has a sexual interest in these boys, and that he was willing to spew out their images and intimate personal details to a total stranger on the internet, without any care whatsoever as to the consequence of identifying these children to another sexual predator. That speaks volumes about this defendant, because it shows that there is no boundary which he will not cross to satisfy his own deviant sexual desires. It also demonstrates the need to impose a long term of supervised release to ensure that this Court can monitor him long after he is released from prison.

The defendant's long-standing involvement in these most horrific crimes, targeting the most vulnerable of children, more than warrants a sentence at the top of his calculated Guideline range. § 3553(a).

### 2. History and Characteristics of the Defendant.

Consideration of this factor warrants the top of the Guideline sentence recommended by the Government. The defendant stands before this Court as a 33-year-old man who has spent years of his adult life involved in child sexual abuse and exploitation crimes. By all accounts he was raised by a loving and supportive family and in a stabile home environment. PSR ¶ 52. He is educated and was employed as an attorney for the Government. He certainly had the means and ability to seek professional help – indeed, since he was a teenager the defendant sought out and engaged in mental health treatment at various points during his lifetime. PSR ¶ 69-72. He even received treatment specific to his sexual offending, beginning in 2022, during the time when he

was also committing these child sex offenses. PSR ¶ 76. Unfortunately, the defendant chose to terminate this treatment after just a few months. *Id.* His sexual crimes against children then escalated, and continued for two more years.

In short, this defendant had so much more support and resources than most every other offender who comes before this Court – and yet he took advantage of none of it. He instead chose to conceal this part of his life from his family and friends and his therapist so that he could continue to engage in his criminal behavior. Consideration of this factor also warrants a sentence at the top of his Guideline range. § 3553(a).

### 3.   The seriousness of the offense, respect for the law, and just punishment.

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). The crimes committed by the defendant were not an isolated occurrence, but part of a pattern of sexually exploitative behavior toward children by the defendant for years. His crimes demonstrate not only the need for a significant term of incarceration, but also that a long term of supervised release is necessary to ensure that he remains in compliance with the Court's directives. The Government recommends a term of at least 20 years of supervision.

### 4.   Deterrence and Consistency in Sentencing

Deterrence is also one of the factors that calls for a significant sentence. The defendant himself needs to be deterred from sexually exploiting children in the future, which the Government believes is best accomplished through the recommended term of incarceration and by the strict conditions mandated by the supervised release term required for his offenses. The public also needs to know that commission of these types of crimes against children will be met with severe punishment. In addition, adherence to the recommended Guideline range assures that

- 19 -

the defendant's sentence is consistent with those imposed nationwide on similarly situated

offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.

### 5. Other Considerations

The recommended top-of-the-Guideline sentence addresses the need to provide the defendant with "educational or vocational training, medical care, or other correctional treatment in the most effective manner…." 18 U.S.C. § 3553(a)(2)(D). The defendant is well educated and has demonstrated that he is capable of obtaining and maintaining employment, so that educational and vocational training are not necessary. His mental health history – and the circumstances of his crimes – provide a basis for mental health treatment, but that can be obtained through the Bureau of Prisons during his term of incarceration, and again while he is on supervised release. There is no reason to mitigate his sentence to address this need.

### 6. Restitution

Although restitution is mandatory for child sex crimes, it is not an issue in this case. No child has sought restitution. § 3553(a)(7).

## IV.    <u>SUPERVISED RELEASE</u>

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The Guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18

U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least 20 years is warranted. As explained above, the defendant admits to years of criminal conduct against children, and a sexual interest in the most vulnerable of children – babies, toddlers, and prepubescent children. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue mental health treatment that promotes rehabilitation and which includes sex offender treatment, § 3553(a)(2)(D).

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as the additional conditions specific to sex offenders.

## IV.  CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a significant sentence at the

top of the Guideline range fully accounts for the scope and severity of the defendant's criminal

conduct and is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Michelle Rotella*
MICHELLE ROTELLA
Assistant United States Attorney

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

William Brennan, Esquire


*/s Michelle Rotella*
MICHELLE ROTELLA
Assistant United States Attorney


DATED:  <u>May 14, 2026.</u>